## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **vs.** | * | **Case No. 23-cr-00043-12 (TNM)** |
| | * | |
| **CARLOS GIOVANI LINARES BOTEO**, | * | |
| **Defendant** | * | |
| | * | |

**ooOoo**

## MEMORANDUM IN AID OF SENTENCING
## BY CARLOS LINARES BOTEO

Defendant Linares Boteo, by his undersigned counsel, respectfully requests that this Honorable Court impose a sentence to a term of imprisonment well below the statutory maximum to take into account his limited participation in the offense, his early acceptance of responsibility, the collateral consequences of his offense and other mitigating factors.  Such a sentence is based on application of the second degree rather than the first degree murder guideline, which Mr. Linares Boteo believes is the appropriate guideline. Such a sentence complies with 18 U.S.C. § 3553(a), which requires this Court to impose a sentence that is "sufficient, but not greater than necessary" to further the purposes of sentencing.

### A.    Nature and Circumstances of the Offense

Mr. Linares Boteo pleaded guilty to a RICO conspiracy arising out of his membership with the 18th Street gang.  Pursuant to this plea agreement, he admitted his involvement in two separate racketeering acts – a robbery in Virginia and the murder of another 18th Street member.[1]  With respect to both acts, his participation is more limited than that of the other participants.  With respect to the

---

[1] Victim # 6, Carlos Ramos Martinez, a.k.a., "Fire."

robbery, the videos of the incident clearly show that Linares Boteo was not the initial aggressor nor one of the active participants. While he decidedly was part of the group of young men who robbed two men in the parking lot of a strip mall, he is not seen landing any blows on the victims. Regardless of how the Court calculates the guidelines for this robbery, granting a mitigating role adjustment or not, the key point is that Linares Boteo was neither the leader, nor the aggressor, nor the one landing punches on the robbery victims.

With respect to the murder of *Fire*, Mr. Linares Boteo was detained in a Maryland prison since 2020, when other 18th Street members allegedly kidnapped and killed *Fire*. It is undisputed that after Linares Boteo was imprisoned on unrelated charges, he was no longer had the Word (*the palabrero)* for the clique.[2] Gov Sen't Memo (ECF 250) at 10. That position was taken over by another 18th Street member. Contrary to what the Government alleges, the person holding the Word is the only one who can authorize or green light the murder or punishment of another.[3] Under the gang's hierarchy, Linares Boteo did not have the authority to order the killing of *Fire* or of anyone else. Linares Boteo was not present when they allegedly voted to kidnap *Fire* and run him out of the clique. Linares Boteo was not present when they allegedly killed *Fire*. After the killing, no one reported back to Linares with any details of the incident.

In the days before the killing, Linares Boteo had three telephone conversations (which were audio recorded by prison authorities) with one of the 18th Street members who is alleged to have been

---

[2] The trial evidence indicates that the leader of the clique, called a *palabrero* is a senior Homeboy, who commands a clique and can order gang members to commit acts of violence, including murder, kidnapping, assault, and robbery.

[3] Trial Trans. 4/11/2024 PM, Testimony of Supervisory Special Agent Fernando Benavides III, pp. 30-32 (in the United States "it's just the palabrero, the clique leader" who can give the order to kill).

the leader of the clique and who participated in the killing. While the government alleges that those conversations included a veiled discussion about murdering *Fire*, in fact no such discussion took place.  Linares Boteo was explicit that had he been in charge he would have beaten up *Fire* on the spot for the perceived transgressions:

> Defendant Boteo explains that he would have given Martinez a beating right there and ordered other *locos* to beat Martinez, stating: "No compassion, brother. You must talk to them aggressively and hit them in the mouth if they talk back. You should have hit him on the mouth right that instant." The 18th Street member pointed out that another clique was present at the time. Defendant Boteo stated, "Right there, so the other clique could see what was going on.

Statement of Offense (ECF 199) at 5; *see also* Jail Call Tr (ECF 250-3) at 4.[4]

| | |
|---|---|
| [Linares] | No, look, brother, I, at that moment brother, I would gone up to him, son of a bitch, it does [UI] |
| [Caller] | That's why I am telling you // [UI] |
| [Linares] | For being so defiant, do you understand? and he could have sucked my dick, and if he jumps me, I would've have fucked him up, crazy, and if I would have had another crazy dude there right next to me, I would have told him to stop him up, you understand, right? |
| [Caller] | Right |
| [Linares] | The stuff is that, you get me? The thing is that one, without mercy dude, one just has to talk like a felon, do you understand me, and at the moment they defy you, well you have to hit them in the mouth, you see? Do you understand me? And... |
| [Caller] | That is what I am telling you... |

---

[4]  AUSA Hart and undersigned counsel have conferred and agree that the identify of the speaker in that transcript (ECF 250-3) was transposed.  In this transcript, MV1 is the caller where in all the other transcripts, MV1 is Linares; MV2 is Linares.

[Linares]        At that instant, you had to hit him in the mouth, do you understand? All right because yeah, that's so the crazy dude can see, what the fuck, you get me? All right.

At no time during any of the three calls does Linares advise that *Fire* should be killed. Nor did Linares have the authority to order or even sanction the killing of *Fire*. At all times, the only advise Linares gives is to explain that he would have taken care of the problem. Linares Boteo was explicit that he would have handled any problems on the spot by beating him up, not by killing him.[5] The reference to doing it at once without thinking about it is a reference to taking action on the spot – by punching him in the mouth – not by killing.

The government's argument that the reason there is no explicit discussion of killing *Fire* is because the defendant was wary of what he said because he was speaking on a recorded jail line is based on a misinterpretation of part of the conversation. When Linares says "the police on top of me, they will screw me," he is speaking literally because at that moment the correctional officer was telling him that it was time to end the call and get off the phone.[6] Moreover, it is clear that multiple times when discussing needing to dispense discipline immediately, Linares is not vague in explaining that he would have beat him and fucked him up.

---

[5] At times, the calls were about Linares' request that Part of the time, they discuss Linares Boteo's request that his friend deposit money in his commissary account.

[6] Jail Call Tr (250-2) at 7-8 ("What the fuck did they already cut you off? Yeah, this fucking son of a bitch guard, that we should cut off the call, do you understand me? Son of a bitch, this fucking son of a bitch. . . .But bro, I have the officer on me now, you understand? He is going to make me move").

**B.     Guidelines Calculation**

Mr. Linares Botero submits that the appropriate guideline is U.S.S.G. § 2A2.2, the second degree murder guideline. Mr. Linares Boteo objects to the application of the first degree murder guideline, U.S.S.G. § 2A1.1(a).  As noted in the Statement of Offense (ECF 199) and as set out above, Linares Boteo did not participate in the actual murder and there is no factual basis to determine that he conspired to commit first degree murder.[7]  The stipulated facts show no more than second degree murder, which the Court defined as "the killing of another person with either the intent to kill *or the intent to inflict such serious bodily harm* that death would be the likely result."  The stipulated facts at most support a finding of an intent to inflict serious bodily harm.  Under U.S.S.G. § 2A1.2, the base offense level should be 38.

With respect to the guidelines calculation for the robbery, Mr. Linares Boteo believes that he is entitled to a mitigating role adjustment under U.S.S.G. § 3B1.2 because he was plainly among the least culpable of those participating in that offense.   Nonetheless, he acknowledges that the application of this guideline will not affect the ultimate sentencing range.  Thus, the significant part of his argument on this offense, is that he was not the initial aggressor, was not the leader of the bunch and was not the one landing punches on the robbery victims.

As far as criminal history, neither offense is a crime of violence.  With respect to the first degree assault under Maryland law (PSR ¶ 94), the Fourth Circuit has held that offense is not a crime

---

[7]     "First degree murder is the intentional killing of another person with willfulness, deliberation, and premeditation. Willful means that the person actually intended to kill the victim. Deliberate means that the person was conscious of the intent to kill. Premeditated means that the person thought about the killing and that there was enough time before the killing, though it may only have been brief, for the assailant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing."  Final Jury Instructions (ECF 215) at 46.

of violence.  *See United States v. Redd,* 85 F.4th 153 (4ᵗʰ Cir.  2023).  Moreover, United States v. Haight, 892 F.2d 1271 (D.C. Cir.  2018), which held on a plain error analysis that Md first degree assault is a crime of violence has been abrogated by *Borden v. United States*, 593 U.S. 420 (2021).[8]

Thus, neither of Mr.  Linares Boteo's prior criminal offense are crimes of violence. Moreover, this particular offense arises out of a familial dispute, where Linares Boteo was the one who ended up in the hospital.  PSR at ¶ 94.[9]  In that light, Criminal History Category III overstates the likelihood of recidivism and the nature of his prior criminal conduct.

Applying the second degree murder guideline, the total offense level is 35, after a reduction for acceptance of responsibility.  With a criminal history III, the sentencing range would therefore be 210 - 262 months.

## C.     History and Characteristics of the Defendant

Mr.  Linares Boteo has a very tragic childhood.  His mother left him behind in Guatemala, while she traveled to the United States, had childnren and formed a new family.  His father was killed by MS-13 in Guatemala in 2012.  PSR ¶ 104.  He himself was also later shot.  The murder of his father by MS-13 drove him to join the 18ᵗʰ Street gang to protect himself against MS-13's threats against him.  As a result and because of threats against him, he made his way to the United States at age 17 and was granted asylum.  PSR ¶ 111.  Once here, the relationship with his mother was strained at best and he once again felt abandoned by her.

---

[8]  "The Supreme Court, Justice Kagan, held that a criminal offense that requires only a mens rea of recklessness cannot count as a "violent felony" under the elements clause of the ACCA, abrogating . . . *United States v. Haight*, 892 F. 3d 1271".

[9]  "The defendant's brother, Manuel Cubias, attempted to subdue the defendant, and the defendant's mother threw an empty liquor bottle at him, hitting him on the head and causing a laceration."

As he explained to the Probation Officer, he felt that the 18th Street gang

> provided him with support and love that he was not receiving at home
> by his own mother who continuously rejected him. He noted he now
> understands that affiliation with the 18th Street gang only brings death
> and suffering to other people.

PSR ¶ 112.

In Guatemala, he sought to become a productive member of society by joining an organization for at risk youth that helped young men like himself develop a trade and train for a sport, as well as assisted them in obtaining their secondary education. Through that organization, he obtained a scholarship to be a commercial electrician and chef as well as to train to be a boxer. The defendant was training for boxing five days per week and took educational classes and completed schoolwork on the weekends. Once his father was killed, he faced threats from the same criminal element that murdered his father. Those plans to become a productive member of society evaporated. At that point, he was able to come to the United States. Once here, his mother's rejection of him continued, with disastrous consequences.

As a result of the instant conviction, he faces deportation. Thus, this Court may reduce his sentence to account for the fortuitous increase in the severity of confinement, which will include a higher security designation as a deportable alien and access to fewer services while in BOP custody. *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994). In his case, he also may once again face violent retaliation by those who killed his father.

## CONCLUSION

For all these reasons, which include his acceptance of responsibility, his tragic childhood, the fortuitous increase in the severity of confinement, and his limited participation in the racketeering activities and his relatively not serious criminal history,  Mr. Linares Botea respectfully requests that the Court impose a sentence at or near 10 years imprisonment.  Such a sentence is "sufficient, but not greater than necessary" and will result in just punishment and protect the public.

Respectfully submitted,

/s/ Carmen D. Hernandez
**Carmen D. Hernandez**
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391
chernan7@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that the instant notice was served via ECF on all counsel of record this 26th day of July, 2026.

/s/ Carmen D. Hernandez
**Carmen D. Hernandez**