**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-CR-43 (TNM)-9** |
| | : | |
| **ELVIS MAURICIO MARADIAGA** **,** | : | |
| **a.k.a. "Smokey"** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing.  For the reasons herein, the United States requests the Court accept the parties' Rule 11(c)(1)(C) plea agreement – itself the product of months of good faith negotiation – and sentence the defendant to 108 months' incarceration on the sole count of conviction.

**I.       FACTUAL AND PROCEDURAL BACKGROUND**

On February 9, 2023, a federal grand jury empaneled in the District of Columbia returned an eleven-count Indictment against twelve members of the transnational criminal street gang known as 18th Street, including the defendant, charging them with participating in a years' long racketeering conspiracy involving two separate cliques[1] operating in and around the D.C.-metro area.  At the center of the Indictment's charges were two separate murders – one of Victim # 6, Carlos Ramos Martinez, a.k.a., "Fire" and the other of Victim # 8, Danis Alcides Salgado Mata, a.k.a., "Caballo," – perpetrated by the gang in furtherance of the conspiracy's objectives.  On February 13, 2024, a new federal grand jury returned a superseding indictment against a select

---

[1] As specified in the Indictment, members of 18th Street are organized into "cliques," or smaller groups operating within specific cities or regions that all operate under the umbrella rules of 18th Street.  Additionally, there are two larger factions of 18th Street consisting of multiple smaller cliques: The Surenos and the Revolucionarios.

number of the original defendants, charging them with certain new offenses based on the same underlying conduct. With respect to the defendant, the grand jury charged him with the overall racketeering conspiracy in Count 1, that is, Conspiring to Participate in a Racketeer Influenced and Corrupt Organization ("RICO Conspiracy"), in violation of 18 U.S.C. § 1962(d)[2], as well as Count 3, Conspiracy to Commit Kidnapping Resulting in Death, in violation of 18 U.S.C. § 1201(c); related to the kidnapping of Fire.

The defendant subsequently entered into a Rule 11(c)(1)(C) plea agreement with the United States. *See* ECF No. 239. The factual basis in support of the defendant's plea of guilty to Count 1 was as follows:

> Beginning in 2019 through February 2023, the defendant, Elvis Mauricio Maradiaga (hereinafter "Maradiaga") was a member or associate of the transnational criminal street gang known as " 18th Street." At the time Maradiaga joined 18th Street and thereafter, the gang was engaged in a variety of criminal activities to include acts of assault, robbery, kidnapping, murder, as well as narcotics and firearms trafficking in the District of Columbia and other jurisdictions, both within the United States and in foreign countries. 18th Street members are required to commit acts of violence to further the interests of the gang. These violent acts are often directed against rival gang members, 18th Street members who have violated gang rules or have otherwise disrespected the gang, and people who are suspected of cooperating with law enforcement.

> Additionally, 18th Street members are also known to possess, sell and transport narcotics, weapons, and other contraband to generate money to support the gang and its criminal activities both within the District of Columbia and across state lines. Some of the proceeds of this criminal activity are wired to members of the gang's leadership in foreign countries. 18th Street members are known to control geographical areas and use violence to maintain their control. 18th Street consists of an enterprise that engages in racketeering activity.

> *Sterling, VA Robbery*

> On February 29, 2020, Defendant Maradiaga and other 18th Street gang members, both named and unnamed in the superseding indictment, were at the Tipicos Los Amigos restaurant located at 46950 Community Plaza #125, Sterling, VA. Upon exiting the restaurant, surveillance footage captured members of the group flashing 18th Street gang hand signs. Defendant Maradiaga and the rest of the group then walked across the parking

---

[2] The defendant was not included in the Special Sentencing Factors as to Count 1.

lot of the plaza in which the restaurant was located and entered First Break Sports Bar located at 46970 Community Plaza #200, Sterling, VA. Shortly thereafter, Defendant Maradiaga and the other members of the group exited the sports bar and approached victims W.S. and P.L. who were standing on the corner of the shopping plaza. Defendant Maradiaga and the other members of his group surrounded the victims and physically separated them. Members of Defendant Maradiaga's group identified themselves as 18th Street gang members and demanded victim P.L. 's money. When P.L. refused, both he and victim W.S. were violently assaulted by multiple members of the 18th Street group. During the course of the assault, members of the 18th Street group stole W.S. 's bookbag and hat, and then fled the scene. Both W.S. and P.L. suffered injuries as a result of the assaults and robbery.  Defendant Maradiaga was captured on surveillance footage participating in the assaults and robbery.

*Narcotics Trafficking*

Defendant Maradiaga also agreed to distribute controlled substances, including marijuana, on behalf of 18th Street.  Defendant Maradiaga would share the proceeds of the sales of any controlled substances with other members of the gang, and those proceeds along with other funds obtained through other gang activities would be pooled together by gang members to fund purchases of additional narcotics and weapons to be used in additional racketeering activity.

*Other Racketeering Activities Including Kidnapping*

At all relevant times, Defendant Maradiaga was a member or associate of the 18th Street gang, knowingly and intentionally agreed with other members, both named and unnamed in the superseding indictment, to participate in its affairs, and agreed that other members of 18th Street would commit multiple racketeering acts in furtherance of the conspiracy, including, but not limited to, acts involving kidnapping rivals and associates of the gang.

*See* ECF No. 240. On June 12, 2024, this Court held a change-of-plea hearing and conducted a

Rule 11 colloquy with the defendant, at the conclusion of which it deferred accepting the (c)(1)(C)

plea agreement pending its review of the Presentence Investigation Report.  *See* 06/12/2024

Minute Entry.

## II.    DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

A.    <u>Generally Applicable Legal Principles</u>

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See *United States v. Gall*, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(i) issued by the Sentencing Commission ...; and

(ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission ... and

4

> (B) that, . . . is in effect on the date the defendant is sentenced.

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

With respect to the decision as to whether to accept a Rule 11(c)(1)(C)

B.     Consideration of Rule 11(c)(1)(C) Plea Agreements

Rule 11 of the Federal Rules of Criminal Procedure vests this Court with broad, though not unbounded, discretion when deciding whether to accept or reject plea agreements. *See In re Morgan*, 506 F.3d 705, 710 (9th Cir. 2007). While on its face, the Rule offers no guidance for what the Court should consider, and the Advisory Committee notes make clear that the question is left to the sound discretion of the trial judge, the case law that has emerged in this area in other sister circuits broadly points to the Court tailoring its analysis to the specific case at hand and assessing whether the sentence or charges called for are too lenient or too harsh and whether the agreement is in the public interest. *See id* at 711. With respect to the specific type of agreement at issue in this case – a "(c) plea" – other courts have followed the framework provided by the United States Sentencing Guidelines, under which an agreement should be accepted "only if the court is satisfied either that such sentence is an appropriate sentence within the applicable guideline range or, if not, that the sentence departs from the applicable guideline range for justifiable reasons." *See United States v. Wright*, 291 F.R.D. 85, 88 (3d Cir. 2013) (citing U.S. Sentencing Guidelines Manual § 6B1.2 cmt. (2012). Beyond that, the analysis has tended to focus on the adequacy of the sentence's length, the factors articulated in 18 U.S.C. 3553(a), and the public interest. *Id.* at 89.

C.    Guidelines Calculations

Turning to 3553(a)(4)(A), for the reasons set forth in its response to the Pre-Sentence Investigation Report (hereinafter, "PSR"), ECF No. 277, the government disagrees with the calculation of the United States Probation Office for the District of Columbia (hereinafter, "U.S. Probation") regarding the defendant's Base Offense Level under the U.S. Sentencing Guidelines (hereinafter, "Guidelines"), and as a result, has reached a different USSG range.

*1.    Offense Level Calculation*

As an initial matter, the government agrees that the relevant Guideline is 2E1.1, which calls for a Base Offense Level of either 19 or, if greater, the applicable level of the underlying racketeering activity.  Where there are multiple types of underlying racketeering activity, each underlying offense is treated as if it were a separate count of conviction subject to the grouping rules of Chapter 3 of the Guidelines.  Where the government disagrees is on what constitutes the underlying racketeering activity for purposes of RICO Conspiracy.  The approach of U.S. Probation is to count as a separate count of conviction each racketeering act charged in the Superseding Indictment in which the defendant was *personally involved*.  The government does not concur in this approach.  First, the government would note that such an approach would run contrary to § 1962(d) itself.  To obtain a conviction for RICO Conspiracy, the government need only prove an agreement between the defendant and one other person that other members of the conspiracy would commit two or more racketeering acts.  *See United States v. Nguyen*, 255 F.3d 1335 (11th Cir. 2001).  The defendant need not have personally committed any racketeering acts to be found guilty of RICO Conspiracy. *See United States v. Salinas*, 552 U.S. 52, 63 (1997); *see also* ECF 215 at 44.  And indeed, it is for this reason that Courts applying § 2E1.1 have found that the "overt acts personally committed by a defendant do not establish the most serious underlying racketeering activity attributable to him."  *United States v. Porraz*, 943 F.3d 1099, 1103 (7th Cir.

2019).  Rather, drawing on principles of relevant conduct articulated in § 1B1.3, courts have looked toward whether the conduct at issue was within the scope of the jointly undertaken criminal activity, in furtherance of it, and reasonably foreseeable to the defendant.  *U.S. v. Garcia*, 754 F.3d 460, 484-85 (7th Cir. 2014).

Here, in the Statement of Offense, the defendant admits to his participation in the conspiracy, noting that "[a]t the time [he] joined 18th Street and thereafter, the gang was engaged in a variety of criminal activities to include acts of assault, robbery, kidnapping, murder, as well as narcotics and firearms trafficking in the District of Columbia and other jurisdictions, both within the United States and in foreign countries."  The defendant further admitted that he "knowingly and intentionally agreed with other members, both named and unnamed in the superseding indictment, to participate in its affairs, and agreed that other members of 18th Street would commit multiple racketeering acts in furtherance of the conspiracy, including, but not limited to, acts involving kidnapping rivals and associates of the gang."  Given that the government has already proven at trial that other 18th Street members committed kidnappings in furtherance of the conspiracy, and given that the defendant has admitted that he knew and agreed that other gang members would be committing such kidnappings, he can be held accountable for other kidnappings, even if he did not personally participate in them himself.

The Seventh Circuit's reasoning in *U.S. v. Garcia*, 754 F.3d 460 (7th Cir. 2014) is instructive on this point.  There, the Court was faced with a member of a particular sect of the Almighty Latin Kings Nation, colloquially referred to as the Latin Kings, which, much like 18th Street, remains a notorious street gang engaged in the full panoply of racketeering activity.  There, one of the defendants, an "Inca" in the gang's parlance, responsible for controlling a small neighborhood of the gang's turf in Chicago, pled guilty without agreement to §1962(d) and

violations of federal narcotics trafficking laws.  At sentencing, the government argued that the relevant Guideline was § 2A1.5, covering Conspiracy to Commit Murder, which the defendant challenged on the basis that he never personally participated in a murder nor did he ever admit to involvement, in any way, in murders during the Rule 11 colloquy.  The Court rejected his challenge and its reasoning is worth quoting in full:

> *Use of Conspiracy To Commit Murder Guideline.* As we have noted, the guideline applicable to RICO is § 2E1.1. It sets a base offense level of either 19 or the level applicable to the underlying racketeering activity. Luis contends that the highest base offense level that can apply to him is the one found in § 2D1.1, the guideline governing a drug distribution conspiracy; the government argued that the proper referent was § 2A1.5, covering conspiracy to commit murder. The district court adopted the government's position. It found that the use of murder as a tool to maintain the gang's reputation, protect its territory, and further its drug trade was foreseeable to Luis when he joined the conspiracy.

> Luis now argues that there was insufficient evidence to show that he either directly participated in acts of murder or violence, or that he could foresee that other Latin Kings would do such things. When he pleaded guilty, he admitted only to drug dealing as a factual basis for the plea. To be held accountable for the conduct of others at sentencing, "that conduct must have been both in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity." United States v. Edwards, 115 F.3d 1322, 1327 (7th Cir. 1997) (citing U.S.S.G. § 1B1.3 n.2).

> Luis was an active participant in the Latin Kings' activities, both as a drug distributor and as an Inca. The questions are thus whether the conspiracy to commit murder was in furtherance of the activities jointly undertaken by gang members, and whether it was foreseeable to him. The district court had ample evidence pointing to affirmative answers. The Latin Kings' constitution and the Little Village Rules expressly contemplated violence, up to and including homicide. During the trial of the other defendants, witnesses testified that the rules meant that Latin Kings members would "kill you, bottom line" if you entered their territory. Traffic violators—especially speeders—were to be shot as they drove through. Luis's duties as an Inca included protecting his territory, and that protection foreseeably led to acts of attempted or actual murder. It does not matter that there was no evidence that he pulled a trigger.

*Id.* at 484-85.  Even putting aside the question of the defendant's personal participation in the kidnapping of Fire, which was not part of the Statement of Offense, the evidence has shown that 18th Street's rules expressly contemplated violence, including kidnappings, the defendant knew

this, expressly agreed to it, and in the end, such kidnappings were in fact carried out to further the gang's goals. As a result, it is relevant conduct under § 1B1.3 and the kidnapping guideline should apply.

As a result, the defendant's underlying racketeering activity should be sub-divided into three distinct groups for purposes of calculating his Guidelines under § 2E1.1. One group for robbery, which the PSR already has, *see* PSR at ¶¶ 74; one group for narcotics trafficking, which the PSR does not have, and one group for kidnapping, which the PSR also omits. Out of those three groups, the group with the highest base offense level is the kidnapping group, with a Base Offense Level of 32, which will govern the count of conviction.

With respect to adjustments, the government agrees that the defendant should not qualify for a two-level reduction in light of his status as a first-time offender because he does not meet the criteria set forth in §4C1.1(a)(3). *See* PSR ¶ 97. The government further agrees that the defendant is entitled to a three-level adjustment based on his acceptance of responsibility in this matter pursuant to §3E1.1. *Id.* at ¶¶ 95-96.

As such, his Total Offense Level, factoring in all adjustments, is 29.

> 2.      *Criminal History*

The government agrees that the defendant's total criminal history score is zero and that he should be in criminal history category I.

> 3.      *USSG Range*

Under the Guidelines, at a Total Offense Level of 29, in Criminal History Category I, the defendant's range is 87-108 months' incarceration.

D.    <u>Sentencing Recommendation</u>

The government respectfully requests that this Court accept the 11(c)(1)(C) agreement reached between the parties after months of negotiation and to sentence the defendant at the top of the range specified therein and the top of the correctly calculated Guidelines range – 108 months. First, as discussed below, such a sentencing range best reflects a careful balancing of all the § 3553(a) factors.   Second, the agreement is also manifestly in the public interest:  it saves the government, Court, and community valuable resources; avoids motions hearings, empaneling a jury, and a jury trial; puts closure on the matter, likely without appellate review; and guarantees a substantial period of incarceration in a matter in which there were significant litigation risks to proceeding to trial.

*1.    Nature and Seriousness of the Offense*

As he himself has admitted, the defendant is an avowed member of 18th Street, a criminal enterprise the single-minded fixation of which is territorial control through violence.   The defendant was not simply a tangential associate of the gang or a mere *civil*, but a full-fledged homeboy within the Los Crazy Brothers ("LCB") clique of 18th Street.   The defendant was a willing disciple of the gang and a practitioner of its methods.   As this Court itself saw during the trial of the defendant's co-defendants, the defendant actively participated in a gang robbery of Wilfredo Sebastian-Lopez and Pedro Lopez in Sterling, Virginia back in 2020, for nothing more than asserting the gang's authority in the presence of young Hispanic men who the gang was counting on not to go to the police.   The defendant was seen on CCTV footage that evening flashing gang signs with his co-conspirators immediately prior to the robbery.   *See* Gov. Tr. Ex. 2.



He was then captured with other members of the gang approaching the victims, to whom they made clear who they represented. *See* 4/17/2024 Trial Trans. AM, Testimony of Wilfredo Lopez, p.15:4-7 (Q:  Did they say which gang?  A:  Yes. They did hand signs, which -- I don't know what they were doing. I don't know the hand signs. But they said they were from the 18th Street.).  The defendant then assisted in separating the two, after which he went off with Pedro Lopez where he participated in the beating just barely within view of the camera.  *See* Gov. Tr. Ex. E10, E11.  As the record has established, both victims suffered noticeable, visible, injuries, *see* Gov. Tr. Exs. E14-16, E18-E21, and indeed Wilfredo Lopez sought treatment afterward at the clinic at his school after having lost his tooth during the gang robbery.  *See* 4/17/2024 Trial Trans. AM, Testimony of Wilfredo Lopez, pp. 34-35.

The defendant also sold narcotics on behalf of the gang, namely marijuana.  Indeed, there is abundant evidence from the defendant's cellphone extraction that he was actively sourcing marijuana for the gang.





While this activity – selling marijuana – might seem benign, as the defendant well knew, the proceeds of his sales were ultimately invested in procuring ever larger quantities of weapons to victimize rivals, associates, innocent civilians, and wayward members.



Finally, as the defendant himself admitted during the course of his plea colloquy, he joined

18th Street knowing full well the range of activities in which it was involved and explicitly agreed

14

and was aware that violence and kidnappings were part of the gang's *modus operandi*. The defendant had risen to the rank of homeboy within LCB, and typically, as this Court is well aware, to ascend to that status a *civil* is typically required to commit violent offenses. Moreover, the defendant was often scene on social media with his co-conspirators flashing gang signs and firearms, including those later used in the gang's violent crimes.



Defendant Maradiaga (far right-hand side wearing the hooded sweartshirt) and others, including co-defendants Gerlin Neptali Diaz-Lopez, Carlos Rolando Martinez-Mora, and Bradley Martinez-Mora, flashing gang signs.

Finally, while not included in the Statement of Offense, one of the government's two cooperators did specify at trial that the defendant was indeed present for the initial meeting at the soccer field in which Luis Argueta-Gomez voiced his desire to switch cliques with the help of Fire. *See* Trial Transcript 4/22/24 PM, Testimony of Felix Quintanilla-Gomez at 8:21-23 (Q: Starting

with the LCB homeboys, who was there? A. Smokey, Vago, Crusty, Joker, and I am pretty sure that's it.")  This is corroborated, to some extent, by social media evidence, namely a picture of a number of 18th Street members, including LCB and TLS homeboys at a soccer field, albeit one the metadata for which suggests it was taken on July 11, 2021, not July 12, 2021, and for which there is no location data.



| | |
|---|---|
| Name: | chat~media_v4~2021-07-12-03-03-12UTC~ca shmoneyxv3~michaelr0187~saved~b~EiQSFT VUYVFzVDB0ZEhuQzhyNmR3S2lhQhoAGgAyA QRIAIAEYAE~v4.jpeg |
| Type: | Images |
| Size (bytes): | 131043 |
| Path: | Cashmoneyxv3.zip/ cashmoneyxv3-248944120-15941483-0-20240 30418/ chat~media_v4~2021-07-12-03-03-12UTC~ca shmoneyxv3~michaelr0187~saved~b~EiQSFT VUYVFzVDB0ZEhuQzhyNmR3S2lhQhoAGgAyA QRIAIAEYAE~v4.jpeg |
| Created: | |
| Accessed: | |
| Modified: | |
| Changed: | |

Furthermore, the same cooperator indicated that Smokey LCB was also present and participating the night that the homeboys voted in favor of Fire's forcible removal from the District that ultimately resulted in his death. *See id.* at 20:15-18. ("Q. So tell us who the LCB homeboys are who were present in the area on JS274? A. Crusty, Joker, Vago, Smokey. And that was pretty much it from LCB.")  Smokey's presence at both meetings would be consistent with his responsibilities as a homeboy within LCB and his participation in the gang's internal affairs with such status.[3]

Ultimately, regardless of whether or not there was proof beyond a reasonable doubt of the defendant's involvement in the conspiracy to kidnap Fire on the night of July 13, 2021, it is uncontroverted that the defendant joined the gang and rose through its ranks with eyes wide open as to how it operated – through violence – and agreed that his fellow gang members would perform a variety of racketeering offenses for the good of 18th Street.  Even though the evidence of the

---

[3] As the government admitted during the June 12, 2024 plea hearing, another government cooperator affirmatively testified under oath that the defendant was not present in such meetings and that he had never said anything to that effect to law enforcement in past debriefs.  Moreover, unlike with other defendants, there is no cell site evidence for the defendant's phone at the time the July 13, 2021 meeting was held which initiated the Fire kidnapping.

defendant's personal participation in violent felonies is limited, the defendant's actions nevertheless contributed to the overall growth of the gang and its reign of terror in the region and merit significant punishment.

### 2.   Defendant's History and Characteristics

The defendant lacks an extensive criminal history and the instant offense would represent his first conviction as an adult.  Nevertheless, as the defendant himself has admitted, he willingly joined 18th Street knowing the violence and havoc it wreaks on communities in the United States and abroad and rose up the organizational ladder to the rank of fully-made member within the enterprise.  Why he did this remains a mystery.  The defendant fled El Salvador and illegally immigrated to the United States when he was 14 to escape violence and gang activity that he saw in his native country.  *See* ECF No. ¶¶ 117-18.  Yet instead of starting a new life in the United States, focusing on his education and employment, he decided to join 18th Street, a road which has led him to this current sentencing.

### 3.   Need for the Sentence Imposed

The government believes that the Court's acceptance of this agreement and a sentence of 108 months' incarceration will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care he may require.  The defendant deliberately joined a criminal organization that has plagued the D.C.-area – and particularly the Hispanic community within it – for years and carried out a racketeering acts for the benefit of this enterprise.  The Court has seen up close the way in which he and his fellow gang members

victimized two young men on the night of February 29, 2020 over nothing more than asserting the gang's dominance in that particular area.   The evidence has also shown the defendant's participation in narcotics trafficking which was done for the explicit purpose of generating more money for the gang's racketeering activities, namely the purchase of weapons.   Furthermore, the defendant explicitly agreed that other homeboys within this gang would be committing acts of violence.   Balanced against these factors is the fact this would be the defendant's first criminal conviction, the defendant was not personally involved in physically perpetrating violence in furtherance of the gang beyond the robbery, and upon being released from prison, the defendant will be promptly deported, enhancing the specific deterrence of the defendant from committing these acts in this community again.   *See United States v. Bennett,* 297 F.R.D. 32, 34 (E.D.N.Y. 2013).   The agreed upon sentencing range, and the government's recommendation, is compliant with the Guidelines and reflects a carefully calibrated assessment of these factors.

Furthermore, as the government emphasized during its exchange with the Court at the June 12, 2024 plea hearing, there were substantial litigation risks for the government in proceeding to trial against the Defendant, particularly with respect to Count 3 of the Superseding Indictment.   As alluded to at that hearing, the current (c) plea agreement reflects the product of the hard work of government counsel and counsel for the defendant to strike an agreed upon-sentencing range which would adequately balance all of the §3553(a) factors discussed above, and give both sides, as well as the public, a degree of closure – for the government, the security of a conviction for an undoubtedly serious offense and the defendant's admission of his participation in a criminal enterprise, and for the defendant, a limit on his exposure at sentencing.

III.     **CONCLUSION**

WHEREFORE, for the foregoing reasons, the government respectfully requests that the

Court accept the Rule 11(c)(1)(C) agreement reached by the parties and sentence the defendant to

108 months' incarceration on Count 1.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:   /s/ *Will Hart*_____
WILL HART
JOHN F. KORBA
SITARA WITANACHCHI
Assistant United States Attorneys
U.S. Attorney's Office for the
District   of Columbia
D.C. Bar No. 1029325 (Hart)
D.C. Bar No. 1010303 (Korba)
D.C. Bar No. 1023007 (Witanachchi)
601 D. St., N.W.,
Washington, D.C. 20530